## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEATHER GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>KATE SPADE & COMPANY, CRAIG A. LEAVITT, DEBORAH J. LLOYD, NANCY J. KARCH, LAWRENCE S. BENJAMIN, RAUL J. FERNANDEZ, CARSTEN FISCHER, KENNETH B. GILMAN, KENNETH P. KOPELMAN, DOUGLAS MACK, JAN SINGER, AND DOREEN A. TOBEN,<br><br>                  Defendants. | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Heather Garcia ("Plaintiff"), by and through her undersigned counsel, for her complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Kate Spade & Company ("Kate Spade" or the "Company") against Kate Spade and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Kate Spade, the "Defendants") for their violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14d-9, 17 C.F.R. 240.14d-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the tender offer

("Tender Offer") by Coach, Inc.("Coach") a wholly owned subsidiary of Chelsea Merger Sub Inc. ("Merger Sub") to purchase all of the issued and outstanding shares of Kate Spade common stock for $18.50 per share (the "Offer Price").

2.      On May 26, 2017, in order to convince Kate Spade shareholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act, and Regulation G, 17 C.F.R. § 244.100.   In particular, the Recommendation Statement contains materially incomplete and misleading information concerning Kate Spade's financial projections and the valuation analyses performed by the Company's financial advisors, Perella Weinberg Partners LP ("Perella").

3.      The Tender Offer is scheduled to expire 11:59 p.m., New York City time, on June 23, 2017 (the "Expiration Date").   It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they can properly determine whether to tender their shares.

4.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the proposed merger unless and until the material information discussed below is disclosed to Kate Spade shareholders or, in the event the proposed merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated

thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6. This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. Kate Spade is incorporated in Delaware and is headquartered in this District. Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8. Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Kate Spade.

9. Defendant Kate Spade is a Delaware corporation with its principal executive offices located at 2 Park Avenue, New York, New York 10016. The Company operates principally under two global, multichannel lifestyle brands: Kate Spade New York and Jack Spade. Kate Spade's common stock is traded on the New York Stock Exchange under the ticker symbol "KATE."

10. Defendant Craig A. Leavitt ("Leavitt") has been Chief Executive Officer ("CEO") and a director of the Company since February 2014. Defendant Leavitt previously

served as Co- President and Chief Operating officer of Kate Spade, LLC from April 2008 through October 2010, when he was named CEO of Kate Spade, LLC.

11.     Defendant Deborah J. Lloyd ("Lloyd") is Chief Creative Officer of the Company and has been a director of the Company since February 2014. Defendant Lloyd joined Kate Spade, LLC as Co-President and Chief Creative Officer in November 2007.

12.     Defendant Nancy J. Karch ("Karch") has been non-executive Chairman of the Board since May 2013 and a director of the Company since 2000.

13.     Defendant Lawrence S. Benjamin ("Benjamin") has been a director of the Company since January 2011.

14.     Defendant Raul J. Fernandez ("Fernandez") has been a director of the Company since 2000.

15.     Defendant Carsten Fischer ("Fischer") has been a director of the Company since July 2016.

16.     Defendant Kenneth B. Gilman ("Gilman") has been a director of the Company since February 2008.

17.      Defendant Kenneth P. Kopelman ("Kopelman") has been a director of the Company since 1996.

18.      Defendant Douglas Mack ("Mack") has been a director of the Company since June 2014.

19.     Defendant Jan Singer ("Singer") has been a director of the Company since May 2015.

20.     Defendant Doreen A. Toben ("Toben") has been a director of the Company since 2009.

21.     Defendants Leavitt, Lloyd, Karch, Benjamin, Fernandez, Fischer, Gilman, Kopelman, Mack, Singer and Toben are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

22.     Coach is a Maryland corporation with its principal executive offices located at 10 Hudson Yard, New York, New York 10001. Coach is a leading New York design house of modern luxury accessories and lifestyle brands.

23.     Merger Sub is a Delaware corporation and wholly-owned subsidiary of Coach.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Kate Spade common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of May 22, 2017, there were 128,623,421 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Kate Spade or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

27.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

(c)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(d)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

## Company Background and Strong Financial Outlook

31.     Kate Spade operates principally under two global, multichannel lifestyle brands: Kate Spade New York and Jack Spade. The Company's four category pillars — women's,

men's, children's and home — span demographics, genders and geographies. In addition, Kate Spade owns the Adelington Design Group, a private brand jewelry design and development group. The Company operates Kate Spade New York and Jack Spade through one operating segment in North America and three operating segments in each of Japan, Asia (excluding Japan), and Europe.

32.     The Company's Kate Spade New York brand offers fashion products for women and children and home products. The Kate Spade New York brand product line includes handbags, small leather goods, jewelry and apparel, along with a variety of licensed products including footwear, fragrances, swimwear and watches, among other items. The Company's Jack Spade brand offers fashion products for men, including briefcases, travel bags, small leather goods, fashion accessories and apparel.

33.     On February 16, 2017, Kate Spade announced its fourth quarter and full year 2016 financial results. For the quarter, the Company reported net sales of $471 million, a 9.8% increase from the fourth quarter of 2015.  Income from continuing operations for the quarter was $87 million, or $0.67 per diluted share, compared to $62 million, or $0.48 per diluted share, in the fourth quarter of 2015. For the full year 2016, the Company reported income from continuing operations of $152 million, or $1.17 per diluted share, compared to $22 million, or $0.17 per diluted share, for the full year 2015. Defendant Leavitt commented on the favorable financial results, stating:

> Our solid fourth quarter and fiscal year performance demonstrate the strength of our differentiated business model, as we continued to gain market share and deliver strong growth despite a challenging retail environment. In 2016, we further strengthened our handbag portfolio, introduced new categories to our casual ready-to-wear classifications, and thoughtfully expanded our global store base, opening 52 net new owned and partner-operated stores.

George Carrara ("Carrara"), Kate Spade's President and Chief Operating Officer, also commented:

> We are pleased to report top-line growth of 14% for the full-year. In 2016, we delivered Adjusted EBITDA margin expansion of 220 basis points compared to the prior year, reflecting our ongoing focus on expense management, as well as the benefit of lower annual incentive compensation year-over-year. We generated robust cash flow and ended the year in a strong financial position, and with nearly $500 million in cash.

34.     On April 18, 2017, Kate Spade reported its first quarter 2017 financial results. Though the Company's net sales slightly declined to $271 million, compared to $274 million in the first quarter of 2016, defendant Leavitt and Carrara remained positive and pleased with the quarter's results.  Defendant Leavitt noted:

> Despite a challenging retail environment and the later Easter holiday, we achieved yet another quarter of double-digit eCommerce comparable sales growth, which helped offset softness in bricks and mortar stores. Against this backdrop, we delivered strong gross margin expansion while working to drive profitable growth across our categories and channels.

Carrara added:

> We delivered over 140 basis points of gross margin expansion in the first quarter driven by operational efficiencies and our continued focus on quality of sale amidst a highly promotional environment. In addition, we continued to generate robust cash flow over the past twelve months and ended the quarter with $422 million in cash. We delivered these solid results despite the factors that negatively impacted our first quarter performance.

**<u>The Process Leading Up to the Proposed Transaction</u>**

35.     On February 1, 2016, defendant Leavitt and Carrara met with Coach's CEO and President to discuss a potential business combination.

36.     On February 16, 2016, Coach delivered a preliminary indication of interest to acquire the Company for $22.00 per share, including a request for exclusivity. Following

discussion, the Board deemed the indication of interest insufficient.

37.    On March 22, 2016, the Board formally engaged Perella as the Company's financial advisor in connection with an acquisition of Kate Spade.

38.    On November 14, 2016, Caerus Investors, a Company stockholder, released a public letter to the Board recommending a sale of Kate Spade.

39.    On June 6, 2016, Carrara met with Coach's President to discuss the retail industry generally.

40.    On November 14 and December 1, 2016, defendant Leavitt met with Coach's CEO regarding a potential transaction.

41.    On December 5, 2016, at the Board's direction, Perella contacted fifteen prospective counterparties, including ten strategic entities and five financial sponsor entities. Three responded that they were interested in further discussions, including Coach, a strategic entity referred to in the Recommendation Statement as "Party A" and a financial sponsor referred to in the Recommendation Statement as "Party B.

42.    On January 7, 2017, Kate Spade entered into a confidentiality agreement with Coach.

43.    On January 17 and January 26, 2017, the Company executed confidentiality agreements with Party A and Party B, respectively. The Recommendation Statement fails to disclose whether these confidentiality agreements contain standstill provisions that operate to preclude either party from submitting a topping bid for the Company.

44.    Party B subsequently informed Perella it would not be submitting a bid for the Company.

45.    On February 13, 2017, Coach submitted a preliminary indication of interest to

acquire Kate Spade in the range of $18.00 – $22.00 per share, consisting of a combination of cash and Coach stock.

46.     That same day, Party A submitted a preliminary indication of interest to acquire Kate Spade in an all cash transaction in the range of $20.00 – $22.00 per share.

47.     Between February 16 and March 21, 2017, Company management participated in meetings with the management of each of Coach and Party A.

48.     On February 27, 2017, Perella provided Coach and Party A with a bid instruction letter, indicating that the submission deadline for final round bids was March 27, 2017.

49.     On March 8, 2017, Party A informed Perella it would not be submitting a bid for the Company.

50.     On March 21, 2017, Coach informed Perella it would not be submitting a bid by the March 27, 2017 deadline and the Board agreed to extend the bid deadline date.

51.     On April 29, 2017, Coach submitted a proposal to acquire the Company for $18.00 per share in cash. Coach included a mark-up of the draft merger agreement, which included a condition that certain key senior Kate Spade management execute retention agreements prior to signing the Merger Agreement.

52.     At a May 1, 2017 Board meeting, the Board reviewed and discussed Coach's offer, the Company's preliminary projections for 2017 through 2019 (the "Projections"), Kate Spade's first quarter results and the underlying trend in the Company's business performance reflected in the first quarter results, including sensitivity analysis related thereto. Following discussion, the Board determined to reject Coach's offer.

53.     On May 2, 2017, Coach submitted a revised proposal to acquire the Company for $18.50 per share in cash, which again included the condition that certain key senior Kate Spade

management execute retention agreements prior to signing the Merger Agreement.

54.     At a May 3, 2017 meeting, the Board again discussed the Projections, including the sensitivity analysis related to the Company's first quarter results. The Board then authorized management and its advisors to proceed with negotiating a transaction. The Board also authorized certain members of the Company's senior management team to initiate negotiation on their respective post-closing retention arrangements with Coach in accordance with the terms previously discussed with the Board, which they negotiated until the parties signed the Merger Agreement on May 7, 2017. The Recommendation Statement completely omits any of the employment related discussions and negotiations that occurred between Coach and the members of Kate Spade's senior management team.

55.     On May 7, 2017, Perella rendered its fairness opinion and the Company's legal advisors reviewed the terms of the arrangements with certain of Kate Spade's senior management team.  The Board then approved and executed the Merger Agreement.

**The Proposed Transaction**

56.     On May 8, 2017, Kate Spade issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> NEW   YORK--May   8, 2017-- Coach, Inc. (NYSE: COH) (SEHK:6388), a leading New York design house of modern luxury accessories and lifestyle brands, today announced it has signed a definitive agreement to acquire Kate Spade & Company (NYSE: KATE). Under the terms of the transaction Kate Spade shareholders will receive $18.50 per share in cash for a total transaction value of $2.4 billion. The transaction represents a 27.5% percent premium to the unaffected closing price of Kate Spade's shares as of December 27, 2016, the last trading day prior to media speculation of a transaction. The transaction has been unanimously approved by the Boards of Directors of Kate Spade & Company and Coach, Inc.
>
> Victor Luis, Chief Executive Officer of Coach, Inc. said, "Kate Spade has a truly unique and differentiated brand positioning with a

broad lifestyle assortment and strong awareness among consumers, especially millennials. Through this acquisition, we will create the first New York-based house of modern luxury lifestyle brands, defined by authentic, distinctive products and fashion innovation. In addition, we believe Coach's extensive experience in opening and operating specialty retail stores globally, and brand building in international markets, can unlock Kate Spade's largely untapped global growth potential. We are confident that this combination will strengthen our overall platform and provide an additional vehicle for driving long-term, sustainable growth."

* * *

Kevin Wills, Coach's Chief Financial Officer added, "Due to the complementary nature of our respective businesses, we believe that we can realize a run rate of approximately $50 million in synergies within three years of the deal closing. These cost synergies will be realized through operational efficiencies, improved scale and inventory management, and the optimization of Kate Spade's supply chain network. At the same time, to ensure the long-term viability and health of the Kate Spade brand, and similar to the steps Coach has itself taken over the last three years, we plan to reduce sales in Kate Spade's wholesale disposition and online flash sales channels. Therefore, the reduction in profitability from the pullback in these channels will be offset by the realization of these substantial synergies. As a result, we expect that the acquisition will be accretive in fiscal 2018 on a non-GAAP basis, and will reach double-digit accretion by fiscal 2019, also on a non-GAAP basis."

Mr. Luis concluded, "The acquisition of Kate Spade is an important step in Coach's evolution as a customer-focused, multi-brand organization. The combination enhances our position in the attractive global premium handbag and accessories, footwear and outerwear categories, bringing product, brand positioning and customer diversification to the portfolio, and establishing scale in key functions with the resources to invest in talent and innovation. In addition, we believe the Kate Spade brand will benefit from our best-in-class supply chain and strong corporate infrastructure."

**Strategic Rationale**

The combination of Coach, Inc. and Kate Spade & Company will create a leading luxury lifestyle company with a more diverse multi-brand portfolio supported by significant expertise in handbag design, merchandising, supply chain and retail operations as well as solid financial acumen. Coach's history and heritage, multi-

channel, international distribution model, and seasoned leadership team uniquely position it to drive long-term sustainable growth for Kate Spade. Coach is focused on preserving Kate Spade's brand independence as well as retaining key talent, ensuring a smooth transition to Coach, Inc.'s ownership.

**Transaction Details**

The transaction is not subject to a financing condition. Coach has secured committed bridge financing from BofA Merrill Lynch. The $2.4 billion purchase price is expected to be funded by a combination of senior notes, bank term loans and approximately $1.2 billion of excess Coach cash, a portion of which will be used to repay an expected $800 million 6-month term loan. The transaction is expected to close in the third quarter of calendar 2017, subject to customary closing conditions, including the tender of a majority of the outstanding Kate Spade & Company shares pursuant to the offer and receipt of required regulatory approvals.

### Insiders' Interests in the Proposed Transaction

57.     Coach and Kate Spade insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Kate Spade.

58.     Company insiders stand to reap a substantial financial windfall for securing the deal with Coach. Notably, Kate Spade entered into letter agreements (the "Deal Completion Bonus Letters") with each of Carrara and Thomas Linko ("Linko"), the Company's Senior Vice President and Chief Financial Officer ("CFO"), pursuant to which each executive will receive a special one-time cash deal completion bonus following each executive's termination of employment with the Company in the amount of $750,000 and $500,000, respectively.

59.     Additionally, the Company's directors and executive officers will receive substantial cash consideration in connection with tendering their shares of Company common stock in the Tender Offer.

60.     Moreover, pursuant to the Merger Agreement, each outstanding Company option, restricted stock unit award, performance share unit award and market share unit award will be converted into the right to receive cash payments.

61.     Further, if they are terminated in connection with the Proposed Transaction, Kate Spade's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation. Defendants Leavitt and Lloyd *each* stand to receive *over $24 million* in severance payments.

## The Recommendation Statement Contains Material Misstatements or Omissions

62.     The defendants filed a materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Kate Spade's stockholders. The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Tender Offer.

63.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Kate Spade's financial projections, relied upon by Kate Spade's financial advisor Perella; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Perella; (iii) Kate Spade insiders' potential conflicts of interest; and (iv) the background process leading to the Proposed Transaction.  Accordingly, Kate Spade stockholders are being asked to make a decision whether to tender their shares in connection with the Tender Offer without all material information at their disposal.

### *Material Omissions Concerning Kate Spade's Financial Projections*

64.      First, the Recommendation Statement fails to provide material information

concerning the Company's financial projections.  Specifically, the Recommendation Statement provides projections for non-GAAP (generally accepted accounting principles) metrics, including, among others, Adjusted EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

65.     When a company discloses non-GAAP financial measures in a Recommendation Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

66.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Kate Spade has included in the Recommendation Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and

revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

67.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

68.     In order to make the projections included on page 33 of the Recommendation Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures (EBITDA) to the most comparable GAAP measures.  Indeed, the Company routinely provides such a reconciliation table in its quarterly financial results releases, and it can therefore undoubtedly provide such a reconciliation table for the projections included in the Recommendation Statement without unreasonable efforts.

69.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Recommendation Statement not

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

misleading.  Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Recommendation Statement: "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Kate Spade may not be comparable to similarly titled amounts used by other companies."  Recommendation Statement 34-35.

70.     The Recommendation Statement also fails to disclose material information relating to the Company's financial projections relied upon by Perella for its analyses.

71.     The Recommendation Statement also sets forth:

> ***Discounted Cash Flow Analysis:***
> Perella Weinberg conducted a discounted cash flow analysis for the Company based on the Wall Street consensus estimates using FactSet ("**Wall Street Consensus DCF**") and the Projections ("**Company Forecast DCF**"), including certain sensitivity cases with respect to the Projections, by:

- calculating, in each case, the present value as of April 1, 2017 of the estimated standalone unlevered free cash flows (calculated as operating income, including stock based compensation expense, after taxes, plus depreciation  and amortization, minus capital expenditures, and adjusting for changes in net working capital and other cash flows) that the Company could generate for the remainder of fiscal year 2017 through fiscal year 2019 using discount rates ranging from 10.5% to 12.5% based on estimates of the weighted average cost of capital of the Company derived using CAPM, and

- adding, in each case, terminal values calculated using terminal value multiples ranging from 8.0x to 10.0x and discounted using rates ranging from 10.5% to 12.5%.

  Perella Weinberg estimated the range of terminal value multiples to 2019 EBITDA utilizing its professional judgment and experience, taking into account current multiples and expectations regarding long-term real growth and inflation.

  Perella Weinberg used a range of discount rates from 10.5% to 12.5% derived by application of the CAPM, which takes into account certain company-specific metrics, including the Company's target capital structure, the cost of long-term debt, marginal tax rate

and Bloomberg three-year adjusted-beta, as well as certain financial metrics for the United States financial markets generally.

From the range of implied enterprise values, Perella Weinberg derived ranges of implied equity values for the Company (discounted at 10.5% to 12.5% and using terminal value multiples ranging from 8.0x to 10.0x). In calculating implied enterprise values, Perella Weinberg included a present value for net operating loss benefits ranging between $197 million and $186 million, depending on the various estimates and sensitivities. To calculate the implied equity value from the implied enterprise value, Perella Weinberg subtracted debt and added cash, cash equivalents, including restricted cash, and the book value of investments in unconsolidated subsidiaries in each case as of April 1, 2017. Perella Weinberg calculated implied value per share by dividing the implied equity value by the fully diluted shares (using the treasury method).

In addition, Perella Weinberg reviewed with the management of the Company and Board of Directors various sensitivities with respect to the Projections. These sensitivities were developed with the consent of, and in consultation with, management and the Board of Directors of the Company. The sensitivities (referred to below as "***2017 Trend Sensitivities DCF***") (i) assumed that the Company's 2017 first quarter performance would continue throughout FY 2017 and incorporate the Projections growth rate for FY 2018 and 2019 EBITDA and assumed that the Company's 2017 first quarter performance would continue throughout 2017 and incorporate the Wall Street consensus growth rate projected for FY 2018 and 2019 EBITDA.

72.     The Recommendation Statement, however, fails to disclose (i) the sensitivity cases used by Perella in the "2017 Trend Sensitivities DCF"; (ii) publicly available financial forecasts relating to Kate Spade used by Perella in its "Wall Street Consensus DCF"; (iii) the Company's standalone unlevered free cash flows that the Company could generate for the remainder of fiscal year 2017 through fiscal year 2019 for each projection case; (iv) the Company's estimated EBITDA over the projection period for each of the projection cases; (v) the Company's projected net operating loss benefits; and (vi) the definition of cash flow from operations and the projection line items used to derive cash flow from operations.

73.     In addition, the Recommendation Statement fails to disclose any information concerning when the sensitivity cases were developed and why they were developed. Notably, the range of implied value per share of $21.30 - $26.90, resulting from the discounted cash flow ("DCF") analysis Perella performed utilizing the Projections, is completely above the Offer Price of $18.50. Not surprisingly, the Offer Price of $18.50 fits into the range of implied value per share of $15.10 - $23.40, resulting from the 2017 Trend Sensitivities DCF analysis Perella performed utilizing the sensitivity cases to the Company's Projections. The timing of and basis for creating the sensitivities to the Company Projections that were utilized by Perella is critical to allow stockholders to observe whether the sensitivities were created solely to be able to fit the Offer Price of $18.50 into a range of "fairness".

74.     The omission of this information renders the statements in the *Certain Unaudited Prospective Financial Information* section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

**Material Omissions Concerning Perella's Financial Analyses**

75.     The Recommendation Statement describes Perella's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Perella's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Perella's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Perella's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Kate Spade's stockholders.

76.     For example, with respect to Perella's *Selected Publicly Traded Companies*

*Analysis*, the Recommendation Statement fails to disclose the benchmarking analyses for Kate Spade in relation to the target companies and the financial operating characteristics and other factors observed by Perella.

77.     With respect to Perella's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the Company's standalone unlevered free cash flows that the Company could generate for the remainder of fiscal year 2017 through fiscal year 2019 for each projection case; (ii) the Company's estimated 2019 EBITDA used to derive the terminal value; (iii) the inputs used to derive the range of discount rates of 10.5% to 12.5%; and (iv) the net operating loss benefits estimates and sensitivities.

78.     The omission of this information renders the following statements on pages 39-40 of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

### Selected Publicly Traded Companies Analysis

Perella Weinberg reviewed and compared certain financial information of the Company to corresponding financial information, market trading data and valuation multiples of certain selected publicly-traded companies. For each of the selected publicly-traded companies, Perella Weinberg calculated and compared financial information and various financial market multiples and ratios based on company filings for historical information and consensus third party research estimates for forecasted information. For the Company, Perella Weinberg made calculations based on company filings for historical information and both consensus third party research estimates and the Projections for forecasted information.

Using publicly available information, Perella Weinberg calculated and compared, for each selected company, (i) the ratio (the "**EV/2017E EBITDA Multiple**") of its enterprise value (based on such company's closing share price as of May 5, 2017) to its calendar year 2017 estimated earnings before interest, taxes, depreciation and amortization ("**EBITDA**") and (ii) the ratio of its share price (based on such company's closing share price as of May 5, 2017) to its calendar year 2017 estimated earnings per share

("**EPS**"). The following table summarizes the results of this review:

**Selected Publicly-Traded Companies EV/2017E EBITDA**
**Multiple Share Price/2017E EPS**

| | | |
|---|---|---|
| Core Peers | | |
| Coach, Inc. | 10.0x | 18.8x |
| Michael Kors Holdings | 5.7x | 9.4x |
| Other Accessible Luxury Companies | | |
| Moncler | 14.5x | 24.1x |
| Lululemon Athletica Inc. | 11.6x | 22.5x |
| Burberry Group, Inc. | 10.8x | 20.3x |
| Hugo Boss AG | 9.9x | 19.8x |
| Ralph Lauren Corporation | 6.9x | 15.6x |

Based on the multiples calculated as described above, Perella Weinberg's analyses of the various selected publicly traded companies and on professional judgments made by Perella Weinberg, Perella Weinberg applied a range of multiples of 7.0x to 8.5x to fiscal year 2017 EBITDA of the Company using Wall Street consensus estimates and the Company management's estimated EBITDA, to derive a range of estimated implied values of approximately $13.60 to $16.40 and $13.50 to $16.30 per Share, respectively. Further, Perella Weinberg applied a range of multiples of 17.0x to 20.0x to fiscal year 2017 EPS of the Company using Wall Street consensus estimates and the Company management's estimated EPS, to derive a range of estimated implied values of approximately $13.60 to $16.00 and $12.80 to $15.10 per Share, respectively. Perella Weinberg compared these ranges to the Offer Price of $18.50 to be received by the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

Although the selected companies were used for comparison purposes, no business of any selected company was either identical or directly comparable to the Company's business. Accordingly, Perella Weinberg's comparison of selected companies to the Company and analysis of the results of such comparisons were not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Company.

***Discounted Cash Flow Analysis***

Perella Weinberg conducted a discounted cash flow analysis for the Company based on the Wall Street consensus estimates using FactSet ("**Wall Street Consensus DCF**") and the Projections ("**Company Forecast DCF**"), including certain sensitivity cases with respect to the Projections, by:

- calculating, in each case, the present value as of April 1, 2017 of the estimated standalone unlevered free cash flows (calculated as operating income, including stock based compensation expense, after taxes, plus depreciation  and amortization, minus capital expenditures, and adjusting for changes in net working capital and other cash flows) that the Company could generate for the remainder of fiscal year 2017 through fiscal year 2019 using discount rates ranging from 10.5% to 12.5% based on estimates of the weighted average cost of capital of the Company derived using CAPM, and

- adding, in each case, terminal values calculated using terminal value multiples ranging from 8.0x to 10.0x and discounted using rates ranging from 10.5% to 12.5%.

Perella Weinberg estimated the range of terminal value multiples to 2019 EBITDA utilizing its professional judgment and experience, taking into account current multiples and expectations regarding long-term real growth and inflation.

Perella Weinberg used a range of discount rates from 10.5% to 12.5% derived by application of the CAPM, which takes into account certain company-specific metrics, including the Company's target capital structure, the cost of long-term debt, marginal tax rate and Bloomberg three-year adjusted-beta, as well as certain financial metrics for the United States financial markets generally.

From the range of implied enterprise values, Perella Weinberg derived ranges of implied equity values for the Company (discounted at 10.5% to 12.5% and using terminal value multiples ranging from 8.0x to 10.0x). In calculating implied enterprise values, Perella Weinberg included a present value for net operating loss benefits ranging between $197 million and $186 million, depending on the various estimates and sensitivities. To calculate the implied equity value from the implied enterprise value, Perella Weinberg subtracted debt and added cash, cash equivalents, including restricted cash, and the book value of investments in unconsolidated subsidiaries in each case as of April 1, 2017. Perella Weinberg calculated implied value per share by dividing the implied equity value by the fully diluted shares (using the treasury method).

In addition, Perella Weinberg reviewed with the management of the Company and Board of Directors various sensitivities with respect to the Projections. These sensitivities were developed with the consent of, and in consultation with, management and the Board of Directors of the Company. The sensitivities (referred to below as "***2017 Trend Sensitivities DCF***") (i) assumed that the Company's 2017 first quarter performance would continue throughout FY 2017 and incorporate the Projections growth rate for FY 2018 and 2019 EBITDA and (ii) assumed that the Company's 2017 first quarter performance would continue throughout 2017 and incorporate the Wall Street consensus growth rate projected for FY 2018 and 2019 EBITDA.

These analyses resulted in the following approximate implied per share equity reference range for the Shares:

| Range of Implied Value | Per Share |
|---|---|
| Company Forecast DCF | $21.30 - $26.90 |
| Wall Street Consensus DCF | $17.50 - $22.00 |
| 2017 Trend Sensitivities DCF | $15.10 - $23.40 |

Perella Weinberg compared these ranges to the Offer Price of $18.50 to be received by the holders of Shares (other than Excluded Shares) pursuant to the Merger Agreement.

### *Material Omissions Concerning Insiders' Potential Conflicts of Interest*

79.     The Recommendation Statement also materially misleads stockholders as to the potential conflicts of interest faced by Kate Spade management and the Board.

80.     The Recommendation Statement sets forth that "[a]lthough such arrangements have not, to our knowledge, been discussed as of the date of this Schedule 14D-9, it is possible that additional members of our current management team will enter into new employment or consulting arrangements with Parent or the Surviving Corporation. Such arrangements may include the right to purchase or participate in the equity of Parent or its affiliates."

Recommendation Statement at 17. Yet, at its May 3, 2017 meeting, the Board "authorized certain members of the Company's senior management team to initiate negotiation on their respective post-closing retention arrangements with Parent in accordance with the terms previously discussed with the Board of Directors." The Recommendation Statement completely fails to set forth any of the employment related discussions and negotiations that occurred between Coach and "certain members of the Company's senior management team" following the May 3, 2017 Board meeting.

81.     Further, the Recommendation Statement discloses that Coach's April 29 and May 2 proposals each included a "condition that certain key senior management of the Company execute retention agreements prior to the signing of the Merger Agreement." Although the Recommendation Statement discloses waiver letter agreements (the "Waiver Letters") the Company entered into with various members of Kate Spade senior management, as the Recommendation Statement fails to disclose the negotiations thereof, it is unclear if these Waiver Letters were entered into in connection with Coach's condition that certain Company executives execute retention agreements.

82.     The Recommendation Statement also fails to disclose any information with respect to the negotiation of the Deal Completion Bonus Letters the Company entered into with defendant Carrara and Linko, the Company's CFO, providing for one-time cash deal completion bonuses of $750,000 and $500,000, respectively.

83.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations

that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

84.     The omission of this information renders the statements in the "Arrangements between the Company and its Executive Officers, Directors and Affiliates" and "Background of Offer and Merger" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Sale Process***

85.     The Recommendation Statement also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

86.     The Recommendation Statement fails to expressly indicate whether the confidentiality agreements the Company entered into with Party A and Party B contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company. Such information is material to Kate Spade stockholders as a reasonable Kate Spade stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

87.     Defendants' failure to provide Kate Spade stockholders with the foregoing material information renders the statements in the "Background of Offer and Merger" section of the Proxy false and/or materially misleading and constitutes a violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act, and SEC Rule 14d-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation

Statement.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violation of Section 14(e) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

83.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

85.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Recommendation Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100

86.     Defendants have issued the Recommendation Statement with the intention of soliciting Kate Spade shareholders to tender their shares.  Each of the Defendants reviewed and

authorized the dissemination of the Recommendation Statement, which fails to provide material information regarding Kate Spade's financial projections and the valuation analyses performed by Credit Suisse.

87.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

88.     The Individual Defendants were privy to and had knowledge of the projections for the Company and the details concerning Credit Suisse's valuation analyses. The Individual Defendants were reckless in choosing to omit material information from the Recommendation Statement, despite the fact that such information could have been disclosed without unreasonable efforts.

89.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision regarding whether to tender their shares if such misrepresentations and omissions are not corrected prior to the Expiration Date.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9,17 C.F.R. § 240.14d-9)**

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

92.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

93.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

94.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

95.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, Defendants undoubtedly reviewed the omitted material information in connection with approving the proposed merger.

96.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision regarding whether to tender their shares if such misrepresentations and omissions are not corrected prior to the Expiration Date.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

97.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Kate Spade within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kate Spade, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

99.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement by Plaintiff to be misleading prior to the date the Recommendation Statement was issued, and had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected.

100.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants that shareholders tender their shares in the Tender Offer.  They were thus directly involved in preparing this document.

101.    In addition, as the Recommendation Statement sets forth, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the merger agreement.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

102.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

103.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e), 14(d)(4) and Rule 14d-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

104.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from closing the

Tender Offer or consummating the proposed merger, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

C.       Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.       Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 5, 2017                              Respectfully submitted,

**MONTEVERDE & ASSOCIATES PC**

By:  /s/ *Juan Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com


*Attorneys for Plaintiff*